## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JANE DOE (a fictitious name),<br>        Plaintiff | : | |
| v. | : | 3:19cv 434 |
| HAZELTON FIRST, INC.;<br>HAZLETON HOSPITALITY, LP;<br>LAST CALL PAUL'S LLC; and<br>RAMADA WORLDWIDE INC.<br>f/k/a RAMADA FRANCHISE SYSTEMS,<br>INC.,<br>        Defendants | :<br>:<br>:<br>:<br>: | CIVIL ACTION NO. |

FILED
SCRANTON

MAR 1 2 2019

PER _____ DEPUTY CLERK

## <u>COMPLAINT</u>

## 12-MEMBER JURY TRIAL DEMANDED

This is an action by a Ramada hotel housekeeper who was raped and

subjected to other sexual assaults at work. Plaintiff's direct manager at the

Ramada by Wyndham hotel in Hazleton, Pennsylvania ("Ramada Hazleton")

repeatedly forced Plaintiff to engage in unwanted sexual activities in the hotel

guest rooms, front office, and hallways. Plaintiff's manager took advantage of her

family's financial vulnerability and threatened Plaintiff with the loss of her job if

1

she reported his conduct.  However, Plaintiff bravely reported her manager to the police, and he was criminally charged with multiple counts of rape, aggravated indecent assault, and harassment.

Plaintiff's employers failed to prevent and remedy this abhorrent behavior.  Instead, the owners of the Ramada Hazleton continued to protect the perpetrator.  After the manager was arrested following Plaintiff's report to the police, one of the owners of the Ramada Hazleton even offered to pay Plaintiff money if she would drop the criminal charges.

The franchisor, Ramada Worldwide Inc., maintained extensive control over the operations of the hotel, its managers, and its housekeepers.  Nevertheless, it, too, allowed this discriminatory work environment to fester for months and failed to take sufficient measures to protect the safety of its employees.

Plaintiff now brings claims for sex discrimination under the Title VII of the Civil Rights Act of 1964 as amended ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), as well as state tort claims, seeking remedy for the harms she has suffered and seeking to prevent other employees from suffering similar workplace abuse.  In support of her claims, Plaintiff alleges:

**Plaintiff**

1.      Plaintiff is an adult female individual residing in Luzerne County, Pennsylvania.

2

2. Plaintiff was employed as a housekeeper at the Ramada by Wyndham hotel located at 1221 North Church Street, Hazleton, PA 18202 ("Ramada Hazleton").

3. Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f) and 43 P.S. § 954(c).

### Hazleton Defendants

4. Defendant Hazelton First, Inc. is a Pennsylvania management corporation and the licensee of the franchise rights to the Ramada Hazleton. Defendant Hazleton First, Inc. has a registered address of U.S. 309, North Hazleton, PA 18201. The principal place of business of Defendant Hazleton First, Inc. is 1221 North Church Street, Hazleton, PA 18202.

5. Defendant Hazleton Hospitality, LP operates or operated a restaurant and bar in the Ramada Hazleton. Defendant Hazleton Hospitality, LP is a Pennsylvania limited partnership with a registered address of U.S. 309, North Hazleton, PA 18201. The principal place of business of Defendant Hazleton Hospitality, LP is 1221 North Church Street, Hazleton, PA 18202.

6. Defendant Last Call Paul's LLC has a license to operate a restaurant at the Ramada Hazleton. Defendant Last Call Paul's LLC is a Pennsylvania limited liability company with a registered address of 134 Woodring Road, Drums, PA 18222. The principal place of business of Defendant Last Call Paul's is 1221

3

North Church Street, Hazleton, PA 18202. Upon information and belief, Last Call Paul's LLC is the successor in interest to Defendant Hazleton Hospitality, LP and currently operates a restaurant at the Ramada Hazleton property.

7.      At all relevant times, the same individuals managed the hotel and restaurant.

8.      Defendant Hazleton First, Inc. holds the liquor license for the hotel restaurant.

9.      Defendants Hazleton First, Inc., Hazleton Hospitality, LP and Last Call Paul's LLC (hereinafter, the "Hazleton Defendants") operate as a joint employer.

10.     The Hazleton Defendants were at all relevant times Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b), *see* Exhibit A, EEOC Determination Letter at 1, and within the meaning of 43 P.S. § 954(b).

**Franchisor Defendant**

11.     At all relevant times, Defendant Ramada Worldwide Inc. is and was the franchisor of the Ramada Hazleton. Defendant Ramada Worldwide Inc. is a Delaware corporation with a registered address of 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810. Defendant Ramada Worldwide Inc. has a principal place of business at 22 Sylvan Way, Parsippany, New Jersey 07054.

4

12.     Previously, the franchisor of the Ramada Hazleton was Ramada Franchise Systems, Inc.  Upon information and belief, Ramada Worldwide Inc. is the successor-in-interest to Ramada Franchise Systems, Inc.

13.     Defendant Ramada Worldwide Inc. exercised, or maintained the right to exercise, the requisite level of control over the operations of Hazleton First, Inc. such that it is Plaintiff's joint employer and/or is vicariously liable to Plaintiff for the acts of its actual or apparent agent and franchisee, Defendant Hazleton First, Inc.

## Jurisdiction and Venue

14.     On or about November 17, 2017, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Exhibit B, Plaintiff's EEOC Charge.

15.     This filing also constituted an initiation of proceedings with the Pennsylvania Human Relations Commission ("PHRC") pursuant to the work sharing agreement between the EEOC and PHRC. *See* Exhibit B.

16.     In the EEOC Charge, Plaintiff named Wyndham Hotel Group, LLC as the franchisor of the Ramada Hazleton.  Exhibit B.

17.     Ramada Worldwide Inc. was on notice of this charge because counsel for Ramada Worldwide Inc. communicated with the EEOC about this charge and

clarified to the EEOC that Ramada Worldwide Inc. serves as franchisor for the Ramada Hazleton.

18.     Plaintiff was issued a Right to Sue letter by the EEOC, which was received on December 14, 2019. *See* Exhibit C.

19.     It has been more than one year since the filing of Plaintiff's Charge of Discrimination with the PHRC.

20.     Plaintiff has complied with all conditions precedent prior to filing this Complaint.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

22.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Luzerne County, Pennsylvania.

24.     This Court may properly maintain personal jurisdiction over the Ramada Worldwide Inc. because Ramada Worldwide Inc.'s contacts with this Commonwealth and this judicial district are sufficient for the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice.

6

25.     This Court may properly exercise personal jurisdiction over Ramada Worldwide Inc. because, *inter alia*, Ramada Worldwide Inc. has had longstanding franchise relationships in this Commonwealth, received remuneration from its franchises in this Commonwealth, communicated with franchisees in this Commonwealth, inspected franchise locations in this Commonwealth, provided training and direction to franchisees to be applied to franchises in this Commonwealth, directed advertising at residents and travelers in this Commonwealth.

26.     Additionally, Plaintiff's claims arise directly out of Ramada Worldwide Inc.'s contacts with the Commonwealth.

## Discrimination on the Basis of Sex

27.     In 2013, Plaintiff was hired as a housekeeper at the Ramada Hazleton.

28.     At all relevant times, the manager of the Ramada Hazleton was Pratap Bonepalli ("Manager Bonepalli").

29.     Manager Bonepalli had the authority to hire employees at the Ramada Hazleton, and he hired Plaintiff.

30.     Manager Bonepalli determined Plaintiff's work schedule.

31.     Manager Bonepalli set Plaintiff's pay rate.

32.     Manager Bonepalli had the authority to fire Plaintiff.

7

33.     Manager Bonepalli supervised Plaintiff's work.

34.     Manager Bonepalli typically lived in a guest room at the Ramada Hazleton between Monday and Friday each week.

35.     One of Plaintiff's job responsibilities was to clean the guest room in which Manager Bonepalli was staying.

36.     On one occasion in March or April 2017, Manager Bonepalli directed Plaintiff to clean the guest room in which he was living. After Plaintiff entered the room to do so, he locked the door behind her.

37.     Manager Bonepalli then approached Plaintiff from behind and forcibly grabbed her chest with one hand. Manager Bonepalli then used his other hand to pull down his own pants and masturbate by touching his own genitalia. Plaintiff was able to see clearly what Manager Bonepalli was doing because there was a mirror in the room.

38.     Plaintiff tried to call out for help, but Manager Bonepalli put his hand over her mouth.

39.     After Manager Bonepalli stopped masturbating, he directed Plaintiff not to tell anyone what happened and exited the room, leaving Plaintiff in the room crying.

40.     Shortly after that first incident, Manager Bonepalli told Plaintiff that a particular guest room was dirty and directed her to clean it.

41. After Plaintiff entered the room, Manager Bonepalli followed her into the room and locked the door behind him. He then forced Plaintiff onto a guest bed and raped her.

42. Manager Bonepalli continued to sexually assault Plaintiff in various ways on a near-weekly basis.

43. On several occasions, Manager Bonepalli approached Plaintiff in the office or hallway and forcibly grabbed her breasts.

44. Manager Bonepalli gestured to Plaintiff that he knew the security cameras were not recording these locations and asked her, "Do you think I'm stupid?"

45. On several other occasions, Manager Bonepalli directed Plaintiff to enter guest rooms at the hotel under the pretense that they required housekeeping services, then forced her onto a bed, and raped her.

46. Plaintiff made efforts to perform her work in the presence of her co-workers when possible in order to avoid these assaults.

47. However, on one occasion, Plaintiff Manager Bonepalli directed another employee to leave the premises under the pretense of purchasing coffee, and after that employee left, Manager Bonepalli sexually assaulted Plaintiff.

48. Manager Bonepalli emphasized to Plaintiff that if she reported his actions, she would be fired.

9

49.   Plaintiff was required to submit to Manager Bonepalli's sexual assaults and demands in order to maintain her job at the Ramada Hazleton.

50.   These unwelcome sexual assaults and sexual demands materially changed the terms and conditions of Plaintiff's employment at the Ramada Hazleton.

51.   One June 2, 2017, Manager Bonepalli directed Plaintiff to enter a guest room under the pretenses of removing garbage. When Plaintiff entered the room, Manager Bonepalli shut the door behind Plaintiff and forced her onto the bed.

52.   Manager Bonepalli ripped Plaintiff's shirt open and attempted to rape her.

53.   Plaintiff managed to push Manager Bonepalli off of her and ran out of the room.

54.   Plaintiff sought safety by running to the laundry room.  There, Plaintiff asked another employee to cover for her if anyone asked where she went, and she called a taxi to take her home.

55.   After this, Plaintiff resigned her employment and did not return to work again at the Ramada Hazleton.

56.   Plaintiff was forced to resign from her employment at the Ramada Hazleton because the sexual assaults and sexual demands were intolerable to her and would have been intolerable to a reasonable person in her position.

57.   On June 2, 2017, the same day as the last sexual assault, Plaintiff reported the sexual assaults to a Pennsylvania State Police trooper.

58.   Manager Bonepalli was arrested on the basis of this report.

59.   Approximately one week after Manager Bonepalli was arrested, Plaintiff received a call from Luis, a man who performed maintenance at the Ramada Hazleton.

60.   Luis said in Spanish that Nataraja Pothireddy (an owner and officer of Hazleton First, Inc.) had told him to call.

61.   Luis said that Mr. Pothireddy would offer Plaintiff money to drop the charges against Manager Bonepalli, but Plaintiff refused.

62.   Manager Bonepalli was criminally charged with multiple counts of rape, aggravated indecent assault, and harassment for his actions toward Plaintiff. See Exhibit D, Criminal Docket for Pratap Bonepalli.

63.   Manager Bonepalli pleaded guilty to a lesser charge, *see* Exhibit D, and, upon information and belief, he was deported from the United States.

11

64. The Hazleton Defendants, acting through Manager Bonepalli, subjected Plaintiff to discrimination and harassment because of her sex, including but not limited to sexual assault and rape.

65. Defendant Ramada Worldwide Inc. exercised, or maintained the right to exercise, the requisite level of control over Hazleton First, Inc. such that it is liable for this discrimination as Plaintiff's joint employer and/or is vicariously liable to Plaintiff for the acts of its actual or apparent agent and franchisee.

66. Following the harassment and assaults, Plaintiff suffered from emotional distress, including but not limited to frequent panic attacks, anxiety, and resulting headaches, which continue to this day.

67. The extreme and outrageous conduct of Plaintiff's employer warrants the imposition of substantial compensatory and punitive damages.

## Lack of Reporting Options

68. To intimidate Plaintiff and discourage her from reporting his conduct, Manager Bonepalli frequently asked Plaintiff about her family and how much she needed the job at the Ramada Hazleton in order to support them.

69. The Hazleton Defendants, acting through Manager Bonepalli, threatened Plaintiff about not being able to care for her family if she lost her job.

70. As found by the EEOC, such threats had both the purpose and effect of deterring Plaintiff from reporting the sexual harassment. *See* Exhibit A at 2.

71. Plaintiff never received an employee handbook from the Ramada Hazleton.

72. Plaintiff was never told by anyone at the Ramada Hazleton that she could report sexual abuse or harassment.

73. Plaintiff never received any training about sexual abuse or harassment.

74. The Hazleton Defendants "failed to actively monitor the workplace, failed to promulgate and disseminate to employees an anti-harassment policy reasonably calculated to preventing sexual harassment or related retaliation, filed to train managers and other employees concerning anti-harassment principles and procedures, and failed to promulgate and disseminate to employees a reasonable procedure for its employees to make complaints or reports of sexual harassment." *See* Exhibit A at 2 (finding that Hazleton First, Inc., and Hazleton Hospitality, LP, acted as a joint employer in this regard; upon information and belief, Last Call Paul's LLC is the successor-in-interest to Hazleton Hospitality).

75. Besides Manager Bonepalli, the only other individual with supervisory authority that Plaintiff knew was Nataraja Pothireddy, an owner and officer of Hazleton First, Inc.

13

76.    Plaintiff was convinced that Mr. Pothireddy would not take any disciplinary actions against Manager Bonepalli because he and Manager Bonepalli were related, and because of interactions she had with Mr. Pothireddy.

77.    For instance, after the annual inspection in 2016, Mr. Pothireddy congratulated Plaintiff for a job well done.  Mr. Pothireddy handed Plaintiff an envelope with a cash bonus, but Manager Bonepalli snatched it out of her hand. Mr. Pothireddy allowed Mr. Bonepalli to keep the envelope with Plaintiff's bonus. This incident confirmed to Plaintiff that she could not make any report to Mr. Pothireddy about Manager Bonepalli.

## Relationship between Franchisor and Franchisee Companies

78.    Hazleton First, Inc. is the franchisee for the Ramada Hazleton, meaning that Hazleton First, Inc. holds the rights to operate under the brand name Ramada by Wyndham. *See* Exhibit E, Franchise Agreement (Franchise Agreement between Hazleton First, Inc. and Ramada Franchise Systems, Inc., which is, upon information and belief, the predecessor entity to Ramada Worldwide Inc.).

79.    Ramada Worldwide Inc. controls the operations of its franchisees pursuant to the detailed standards specified in the Ramada Worldwide Standards of Operation and Design Manual ("Ramada Manual"). Exhibit F.

80.    Through the standards in the Ramada Manual, Ramada Worldwide Inc. exercises significant control over the jobs of employees such as housekeepers

14

and managers, the operation of the Ramada Hazleton, and the maintenance of records for the Ramada Hazleton.

81. Upon information and belief, Hazleton First, Inc., as the franchisee for the Ramada Hazleton, was at all relevant times subject to the Ramada Manual or a revised version that is substantially similar.

82. Ramada Worldwide Inc. also provides significant mandatory training for franchise owners and managers, and it reserves the right to require additional remedial training for franchise owners, managers and other employees as appropriate.

### A. Control over Daily Operations of Ramada Housekeepers

83. Ramada Worldwide Inc. exerts significant control over the daily activities of housekeepers such as Plaintiff at Ramada franchise locations through the detailed standards in the Ramada Manual. Exhibit F.

84. Plaintiff was trained on the Ramada standards for housekeeping when she began work at the Ramada Hazleton.

85. Ramada Worldwide Inc. regulates, among other things:

a. the clothing of housekeepers at the Ramada Hazleton, including permissible colors for shirts and slacks, *see* Exhibit F at 21;

b. the shoes of housekeepers at the Ramada Hazleton, *see* Exhibit F at 21;

15

c.     the process of cleaning guest rooms for housekeepers at the Ramada Hazleton, *see* Exhibit F at 41;

d.     housekeepers in their cleaning of bedsheets and towels at the Ramada Hazleton, for instance by requiring housekeepers to implement a towel and linen re-use program.  Indeed, Ramada Worldwide Inc. even regulates the placement of the program cards for the towel and linen re-use programs and specifies when the housekeeper must wash linens for guests participating in the linen re-use program. Exhibit F at  42–43.

86.    With these detailed standards for appearance, cleaning processes, and laundering schedules, Ramada Worldwide Inc. set specific rules and policies for nearly every aspect of Plaintiff's day-to-day activities.

B. Enforcement of Rules and Policies for Housekeepers

87.    Housekeeping standards are an essential part of the business and brand of Ramada Worldwide Inc.

88.    Ramada Worldwide Inc. enforces housekeeping standards at the Ramada Hazleton through periodic property evaluations. *See* Exhibit F at 15.

89.    The evaluation of housekeeping comprises a significant portion of the franchise evaluation by Ramada Worldwide Inc. *See* Exhibit F at 16.

16

90.    Ramada Worldwide Inc. also enforces housekeeping standards through unannounced inspections of Ramada franchises. *See* Exhibit F at 16.

91.    Housekeeping is one of the major categories of the evaluation of such unannounced inspections of the Ramada franchise. *See* Exhibit F at 17.

92.    Through these regular inspections, Ramada Worldwide Inc. exerts control and direction over the housekeepers at Ramada franchises.

93.    Ramada Worldwide Inc. periodically inspected the Ramada Hazleton during Plaintiff's employment.

94.    Manager Bonepalli and Hazleton First, Inc. (though Mr. Pothireddy) communicated to Plaintiff that housekeeping was an essential part of the inspection by Ramada Worldwide Inc.

95.    Indeed, Mr. Pothireddy recognized that Plaintiff's housekeeping was a significant reason that the 2016 inspection had gone well for Hazleton First, Inc. when he offered Plaintiff a cash bonus after the inspection.

C. Control over Daily Operations of Hotel Managers

96.    Ramada Worldwide Inc. exercises significant control over the daily operations of hotel managers such as Manager Bonepalli though the detailed standards in the Ramada Manual. Exhibit F.

97.    Ramada Worldwide Inc. requires that each franchisee designate an on-site General Manager. Exhibit F at 8.

17

98.     Upon information and belief, Manager Bonepalli served as the on-site General Manager of the Ramada Hazleton.

99.     Ramada Worldwide Inc. regulates, among other things:

a.      the logging and presentation of complaints to the General Manager, Exhibit F at 8;

b.      when any General Managers at Ramada properties must see any guest requesting to speak with them, Exhibit F at 13;

c.      how General Managers at Ramada properties must ensure proper procedures during check-in and check-out, Exhibit F at 13;

d.      the presentation of lost articles to the General Manager, Exhibit F at 14;

e.      the frequency with which the General Manager must respond to guest feedback on internet travel websites, including guidelines for responding to such feedback, Exhibit F at 14–15; and

f.      the frequency with which the General Manager accesses the franchisor's online system and messaging tool in order to retrieve and act upon alerts from the franchisor, Exhibit F at 72.

100.    Through these standards, Ramada Worldwide Inc. exerts significant direction and control over the day-to-day activities, job performance, and operation of General Managers such as Manager Bonepalli.

## D. Training by Ramada Worldwide Inc.

101.   Ramada Worldwide Inc. requires significant training for Hazleton First, Inc. and reserves the right to mandate remedial or additional training when appropriate.

102.   Ramada Worldwide Inc. provided mandatory opening training to Hazleton First, Inc. Exhibit E at ¶ 4.1.3.

103.   The General Manager of the Ramada Hazleton must attend mandatory training by Ramada Worldwide Inc. See Exhibit E at ¶ 3.5.

104.   The General Manager of the Ramada Hazleton must attend an orientation training program offered by Ramada Worldwide Inc., which may last as long as two weeks. Exhibit E at ¶ 4.1.1.

105.   Any replacement General Manager at the Ramada Hazleton must attend a complete orientation subject to the satisfaction of Ramada Worldwide Inc. no later than 90 days after he or she assumes the position. Exhibit F at 18.

106.   All General Managers of the Ramada Hazleton must complete a recertification training by Ramada Worldwide Inc. every three years. Exhibit F at 18.

107.   The owner of the Ramada Hazleton must attend an orientation training program offered by Ramada Worldwide Inc. Exhibit E at ¶ 4.1.2.

108. Ramada Worldwide Inc. reserves the right to require Hazleton First, Inc., its General Manager, or its staff to participate in remedial training when necessary. Exhibit E at ¶ 4.1.4.

109. Ramada Worldwide Inc. reserves the right to offer additional mandatory training to Hazleton First, Inc. Exhibit E at ¶ 4.1.5.

110. Through these requirements, Ramada Worldwide Inc. assumes significant responsibility for the training of its franchisees and reserves the right to require additional training for franchisees where appropriate.

## E. Books and Records

111. Ramada Worldwide Inc. provides specifications for how Hazleton First, Inc. must record its transactions, including, upon information and belief, transactions relating to employee payroll and personnel files. Exhibit E ¶ 3.8.1.

112. Ramada Worldwide Inc. reserves the right to audit the books and records of Hazleton First, Inc., which, upon information and belief, includes employee records, payroll, and personnel files. Exhibit E ¶ 3.8.2.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII:
## QUID PRO QUO
## AGAINST ALL DEFENDANTS

113. Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth herein.

20

114. Title VII prohibits employers from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment, because of, inter alia, an individual's sex. 42 U.S.C. § 2000e-2(a)(1).

115. During her employment with Defendants, Plaintiff was subject to regular and severe sexual assaults at the hands of her immediate supervisor, Manager Bonepalli.

116. Manager Bonepalli had the authority to hire and fire Plaintiff and to alter her work conditions, as a result of the authority granted to him by Defendants Hazleton First, Inc. and Ramada Worldwide Inc.

117. Defendants Hazleton Hospitality LP and/or Last Call Paul's LLC share ownership, employees, and supervision with Hazleton First, Inc. such that they constitute a joint employer with Hazleton First, Inc.

118. Ramada Worldwide Inc. exercised, or maintained the right to exercise, the requisite level of control over the operations of Defendant Hazleton First, Inc. such that it was Plaintiff's joint employer and/or is vicariously liable to Plaintiff for the actions of its actual or apparent agent and franchisee, Hazleton First, Inc.

119. Plaintiff has been injured as a result of the Defendants' conduct in that she suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anxiety, social disruption, and psychological and emotional harm, as well as associated physical symptoms.

120. The conduct engaged in by the Defendants constitutes reckless indifference to the rights of Plaintiff sufficient to subject them to punitive damages.

## COUNT II
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII:
## HOSTILE WORK ENVIRONMENT
## AGAINST ALL DEFENDANTS

121. Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth herein.

122. During her employment with Defendants, Plaintiff was subjected to severe and pervasive sexual assaults and harassment at the hands of Manager Bonepalli.

123. Defendants failed to take reasonable steps to prevent harassment in the workplace at the Ramada Hazleton.

124. The Hazleton Defendants failed to implement a sexual harassment reporting system existed at the Ramada Hazleton.

125. The Hazleton Defendants failed to properly train employees on sexual discrimination.

126. Defendant Ramada Worldwide Inc. failed to require and/or enforce adequate sexual harassment reporting systems for employees at Ramada franchises.

22

127. Defendant Ramada Worldwide Inc. failed to properly train Hazleton First, Inc. on sexual discrimination.

128. Plaintiff has been injured as a result of the Defendants' conduct in that she suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anxiety, social disruption, and psychological and emotional harm, as well as associated physical symptoms.

129. The conduct engaged in by the Defendants constitutes reckless indifference to the rights of Plaintiff sufficient to subject them to punitive damages.

## COUNT III
## SEX DISCRIMINATION IN VIOLATION OF THE PHRA
## QUID PRO QUO
## AGAINST ALL DEFENDANTS

130. Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

131. Defendant Ramada Worldwide Inc. exercised, or maintained the right to exercise, the requisite level of control over the operations of Defendant Hazleton First, Inc. such that it was Plaintiff's joint employer and/or is vicariously liable to Plaintiff for the actions of its actual or apparent agent and franchisee, Hazleton First, Inc.

132. The PHRA prohibits the discrimination by any employer on the basis of sex with respect to compensation, hire, tenure, terms, conditions or privileges of employment. 43 P.S. § 955(a).

23

133.   During her employment with Defendants, Plaintiff was subjected to regular and severe sexual assaults at the hands of her immediate supervisor, Manager Bonepalli.

134.   Plaintiff has been injured as a result of the Defendants' conduct in that she suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anxiety, social disruption, and psychological and emotional harm, as well as associated physical symptoms.

**COUNT IV**
**SEX DISCRIMINATION IN VIOLTION OF THE PHRA:**
**HOSTILE WORK ENVIRONMENT**
**AGAINST ALL DEFENDANTS**

135.   Plaintiff incorporates the preceding paragraphs by reference as though fully set forth at length herein.

136.   During her employment with Defendants, Plaintiff was subjected to severe and pervasive sexual assaults and sexual harassment by her immediate supervisor, Manager Bonepalli.

137.   Defendants failed to take reasonable steps to prevent harassment in the workplace at the Ramada Hazleton.

138.   The Hazleton Defendants failed to implement a sexual harassment reporting system at the Ramada Hazleton.

139.   The Hazleton Defendants failed to properly train employees on sexual discrimination.

24

140.   Defendant Ramada Worldwide Inc. failed to require and/or enforce adequate sexual harassment reporting systems for employees at Ramada franchises.

141.   Defendant Ramada Worldwide Inc. failed to properly train Hazleton First, Inc. on sexual discrimination.

142.   Plaintiff has been injured as a result of the Defendants' conduct in that she suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anxiety, social disruption, and psychological and emotional harm.

## COUNT V: NEGLIGENT HIRING, SUPERVISION, AND RETENTION AGAINST ALL DEFENDANTS

143.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

144.   The Hazleton Defendants were aware, or should have been aware, that Manager Bonepalli was unfit to supervise employees at the Ramada Hazleton.

145.   For instance, Nataraja Pothireddy (an owner and officer of Hazleton First, Inc.) witnessed Mr. Bonepalli stealing a bonus that was intended for Plaintiff.

146.   The Hazleton Defendants were also aware, or should have been aware, that Manager Bonepalli increased his consumption of alcohol on the premises of Ramada Hazleton in 2017.

147.   Defendant Ramada Worldwide Inc. exercised, or maintained the right to exercise, the requisite level of control over the operations of the Hazleton First, Inc. such that it was Plaintiff's joint employer and/or is vicariously liable to Plaintiff for the actions of its actual or apparent agent and franchisee.

148.   The Defendants had a duty to ensure that their premises were safe for employees.

149.   The Defendants had a duty to ensure that employees were adequately trained.

150.   The Defendants had a duty to exercise reasonable care to prevent their employees from harassing or assaulting other employees, including Plaintiff.

151.   The negligence, carelessness, and recklessness of the Defendants includes, but is not limited to:

a.   Failing to properly screen their employees who were given supervisory authority;

b.   Failing to maintain proper supervision of their premises;

c.   Failing to properly train their employees on sexual harassment;

d.   Failing to implement a reporting system for sexual harassment;

e.   Failing to protect Plaintiff from the violent and harassing acts of Manager Bonepalli, which the Defendants knew or should have known were likely to occur at their premises;

f.    As to Defendant Hazleton First, Inc., failing to take corrective actions and investigate further when Manager Bonepalli was seen stealing a bonus intended for Plaintiff; and

g.    As to Defendant Hazleton First, Inc., attempting to bribe Plaintiff to drop the criminal charges against Manager Bonepalli.

152.   Defendants knew or should have known that their failure to properly screen and/or supervise their employees could result in abuses of power and injuries to the Plaintiff.

153.   Despite their knowledge, Defendants acted with reckless indifference to the safety of others by selecting, hiring, retaining, and failing to supervise Manager Bonepalli.

154.   Defendants' actions and/or omissions were committed with reckless disregard for Plaintiff's well-being.

155.   As a direct result of the negligence, carelessness, and recklessness of the Defendants, Plaintiff suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anxiety, social disruption, and psychological and emotional harm, as well as associated physical symptoms.

156.   All of Plaintiff's losses and damages are due solely to the carelessness, negligence, and recklessness of Defendants, without any negligence or want of due care on Plaintiff's part contributing thereto.

27

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that a judgment be entered in her favor and against Defendants and requests the following relief:

a.    An order awarding compensatory damages on all counts herein;

b.    An order awarding punitive damages on Counts I and II (Title VII claims);

c.    An order awarding attorneys' fees for Counts I-IV (Title VII and PHRA) ;

d.    All forms of damages permitted by Title VII and the PHRA;

e.    An award of prejudgment and post-judgment interest;

f.    All forms of damages attributable to Defendants' violations as alleged herein;

g.    Injunctive relief requiring Defendants to implement sexual harassment training and sexual harassment reporting systems at the Ramada Hazleton; and

h.    All other relief the Court deems just and proper.

Plaintiff demands a 12-member jury on all issues so triable.

28

Respectfully Submitted,

Dated: March 12, 2019

Chelsea Edwards, Esq.
    PA 321089
cedwards@justiceaworklegalaid.org
Liz M. Chacko, Esq.
    PA 95115
lchacko@justiceatworklegalaid.org
Justice at Work f/k/a Friends of Farmworkers
990 Spring Garden St, Ste. 300
Philadelphia, PA 19123
Telephone: (215) 733-0878
Facsimile: (215) 733-0876

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE,
          Plaintiff,              :

v.                           :      CIVIL ACTION NO.

HAZLETON FIRST, INC., et al.,
          Defendants.         :

## **INDEX OF EXHIBITS TO COMPLAINT**

**Exhibit**   **Title/Description**

**A**      EEOC Charge Determination, *with identifying information redacted*

**B**      EEOC Charge, *with identifying information redacted*

**C**      Right to Sue Letter, *with identifying information redacted*

**D**      Luzerne County Court of Common Pleas Docket Report for case CP-40-CR-0002516-2017

**E**      Franchise Agreement

**F**      Ramada Worldwide Inc. Standards of Operation & Design Manual, *filed under seal*

# Exhibit A to Complaint

EEOC Charge Determination, *with identifying information redacted*



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**

801 Market Street, Suite 1300
Philadelphia, PA 19107-3127
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Philadelphia Status Line: (866) 408-8075
Philadelphia Direct Dial: (215) 440-2602
TTY (215) 440-2610
FAX (215) 440-2632, 2848 & 2604

Charge Number: ▮▮▮▮▮▮▮
Charge Number: ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮

c/o Justice at Work
990 Spring Garden, Suite 300
Philadelphia, PA 19123                          **Charging Party**

Hazleton First Inc., d/b/a Ramada Inn Hazleton,
Hazleton Hospitality, LP
RR 2 Box 28
1221 North Church Street
Hazleton, PA 18202                              **Respondents**

## DETERMINATION

Under the authority conferred upon me by the Commission, I issue the following determination as to the merits of the above-referenced charges of discrimination filed under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). Respondent is an employer within the meaning of Title VII and all other requirements for coverage have been met.

Charging Party ▮▮▮▮▮▮▮▮▮▮▮▮ was employed as a housekeeper at Respondent's Ramada Inn Hotel in Hazleton, Pennsylvania. Charging Party alleges that she was subjected to sexual harassment and discrimination because of her sex, female, by Respondent and its Front Desk Manager Pratap Bonepalli (a.k.a. "Patrick"). Specifically, Charging Party alleges that during the period April 2017 to June 2017. Bonepalli sexually assaulted her numerous times. These alleged assaults occurred at the workplace during Charging Party's work hours. Charging Party further alleges that Bonepalli raped her in his room at Respondent's hotel numerous times during the period April 2017 to June 2017. Charging Party alleges Bonepalli subjected her to threats in order to discourage her from reporting his unlawful conduct to anyone. Charging Party further alleges that Respondent constructively discharged her on June 2, 2017.

Respondent denies Charging Party's allegations and states that it has a "Zero tolerance policy for any type of harassment in the workplace." Respondent's owner, Nataraja Pothireddy, states that the Charging Party never reported any type of harassment, and that he did not know why Charging Party resigned her employment. Respondent asserts that when it attempted to contact Charging Party to ascertain why she quit, she declined to respond. Respondent does not admit or deny whether Bonepalli sexually assaulted or raped Charging Party.

As a threshold matter, the Commission's investigation revealed that Respondent Hazleton First, Inc., d/b/a Ramada Inn Hazleton, operated during the relevant period as single employer/integrated enterprise or joint employer with Hazleton Hospitality, LP, a restaurant and bar which is located at the Ramada Hotel. As such, Hazleton First, Inc. and Hospitality, LP are both subject to the instant charge of discrimination as Respondents to this proceeding, including this Determination and conciliation efforts to follow.[1]

Turning to the merits of the charge of discrimination, the evidence obtained during the investigation of this matter revealed that Respondent, acting through Bonepalli, subjected Charging Party and at least one other female employee to harassment because of their sex, female, including but not limited to sexual assault/rape. Indeed, law enforcement authorities in Pennsylvania charged Bonepalli with multiple counts of rape and other sex crimes, and he has now pleaded guilty to aggravated sexual assault against Charging Party and one other aforementioned female employee. The evidence further revealed that Respondent, acting through Bonepalli, subjected Charging Party to threats of not being about to care for her family if she lost her job. This threat had both the purpose and effect of deterring her from reporting the sexual harassment. The evidence also revealed that Respondent failed to actively monitor the workplace, failed to promulgate and disseminate to employees an anti-harassment policy reasonably calculated to preventing sexual harassment or related retaliation, failed to train managers and other employees concerning anti-harassment principles and procedures, and failed to promulgate and disseminate to employees a reasonable procedure for its employees to make complaints or reports of sexual harassment. Finally, the evidence revealed that Charging Party resigned her employment because of the repeated sexual harassment, and a reasonable person in such circumstances would also feel compelled to resign their employment.

Based on analysis of the evidence in this matter, I have determined that there is reasonable cause to believe that Respondent subjected Charging Party to harassment that created a hostile work environment because of her sex, female, in violation of Title VII. I have further determined that Respondent subjected Charging Party to constructive discharge because of her sex, female, in violation of Title VII.

Arising out of the investigation, I have further determined that there is reasonable cause to believe that Respondent subjected Charging Party to retaliatory adverse actions (threats) because of her opposition to unlawful employment practices and in anticipation of her participation in violation of Section 704(a) of Title VII.

Arising out of the investigation, I have further determined that there is reasonable cause to believe that since at least 2013 and continuing until 2017 Respondent subjected female employees, as a class, to harassment that created a hostile work environment because of their sex in violation of Title VII.

Arising out of the investigation, I have further determined that there is reasonable cause to believe that Respondent has failed to make and keep for the required periods payroll and other records regarding employees in violation of 29 C.F.R. §§ 1620.32(a) – (c) (which incorporate by reference the requirements of 29 C.F.R. § 516) and 1627.3(a).

---

[1] The term "Respondent" hereafter refers collectively to all Respondents identified in this Determination.

2

Arising out of the investigation, I have further determined that there is reasonable cause to believe that Respondent has failed to retain – for one year after their making or receipt or the personnel action involved (whichever is later) or until the final disposition of a charge proceeding or lawsuit to which they are relevant – various personnel records required by law to be preserved for evidence, including but not limited to job applications, payroll records, resumes, and other personnel records. These actions constitute a violation of record-keeping requirements imposed by Commission procedural regulations set forth at 29 C.F.R. §§ 1602.14, 1620.32, and 1627.3.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the Respondent to join with it in reaching a just resolution of this matter. The confidentiality provisions of Sections 706 and 709 of Title VII, and Commission Regulations apply to information obtained during conciliation. If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

The Commission representative will contact each party soon to begin conciliation.

On Behalf of the Commission,

_____8/1/18_____

Date

_____
Jamie R. Williamson
District Director

cc:     Nataraja Pothireddy (for Respondent)
        Chelsea Edwards, Esq. (for Charging Party)

3

# Exhibit B to Complaint

EEOC Charge, *with identifying information redacted*



**U.S. Equal Employment Opportunity Commission**
**Philadelphia District Office**

801 Market Street
Suite 1300
Philadelphia, PA 19107
(215) 440-2602
TDD: 1-800-669-6820
Fax: (215) 440-2604
1-800-669-4000

Respondent: HAZLETON FIRST INC.
EEOC Charge No.: █████████
FEPA Charge No.:

March 14, 2018



C/O Friends Of Farmworkers
699 Ranstead Street, 4th Floor
Philadelphia, PA 19106

Dear Ms. ████████████ :

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

| | |
|---|---|
| [X] | Title VII of the Civil Rights Act of 1964 (Title VII) |
| [ ] | The Age Discrimination in Employment Act (ADEA) |
| [ ] | The Americans with Disabilities Act (ADA) |
| [ ] | The Equal Pay Act (EPA) |
| [ ] | The Genetic Information Nondiscrimination Act (GINA) |

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

Please be aware that we will send a copy of the charge to Pennsylvania Human Relations Commission 333 Market Street Floor 8 Harrisburg, PA 17126 as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

The quickest and most convenient way to obtain the contact information and the status of your charge is to use EEOC's Online Charge Status System, which is available 24/7. You can access the system via this link (https://publicportal.eeoc.gov/portal) or by selecting the "My Charge Status" button on EEOC's Homepage (www.eeoc.gov). To sign in, enter your EEOC charge number, your zip code and the security response. An informational brochure is enclosed that provides more information about this system and its features.

While your charge is pending, please notify us of any change in your address, or where you can be reached if you have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Dilip Gokhale
Investigator
(215) 440-2634

www.eeoc.gov

Enclosure(s):



# WHAT YOU SHOULD DO
# AFTER YOU HAVE FILED A CHARGE WITH EEOC

## ➢ *KEEP YOUR DOCUMENTS – BOTH PAPER AND ELECTRONIC*

Now that you have filed an EEOC charge, you must keep anything that might be evidence related to your charge. This includes *all* documents, communications, and electronic information that are potentially related to your EEOC charge, including the harm caused by the discrimination, and all records of your communications with the EEOC. Even if you are not sure whether the information is relevant to your discrimination claim, please do not throw it away or delete it.

---

### ➢ *WHAT INFORMATION MUST YOU KEEP?*
- **Paper documents**, such as:
    - o Employee manuals, pay stubs, work schedules
    - o Letters, memos, your notes
    - o Pictures, drawings, charts, whether or not they contain words
- **Electronic information**, such as:
    - o E-mails, text messages, tweets, and social media posts and pictures
    - o Voice messages, video and sound recordings
    - o Word processing documents, electronic calendar entries
- **Electronic memory on devices or the devices themselves**, such as:
    - o Memory on computers, laptops, tablets, cell phones
    - o Computers, laptops, tablets, cell phones
    - o Do not delete, replace, alter, "wipe," or "clear" your computer hard drive, electronic tablet, or cell phone, and do not change or remove Internet posts, without retaining an electronic copy. If you dispose of any old computers, phones or devices, make sure you make and keep an electronic copy of all potentially relevant information on the device.
- These are some examples and not a complete list.
- If you have questions about what you should or should not do, please contact your investigator.

---

*Why must you keep this information?* It might be evidence related to your charge. We are required by the courts to ensure that all potentially relevant information is retained. **Please note that failure to keep these records may cause you to lose your case, or to lose the right to recover money lost due to the discrimination.**

*What happens to your information?* Your investigator will discuss with you what information is needed by the EEOC to investigate your charge. Information that you provide that happens to be private or personal in nature will not be disclosed by the EEOC during its investigation, and if the EEOC files suit on your charge, we will do our best to keep such information out of the court proceedings.

*Please see page 2 for additional important information.*

## ➢ *LOOK FOR WORK IF YOU ARE OUT OF WORK*

If you lost your job or were not hired due to discrimination, you may be entitled to the pay or wages you lost. However, you cannot receive lost wages unless you can show that you looked for another job to replace the one you lost or were denied due to discrimination. In order to prove you searched for work, you must keep copies of all letters, emails, or other evidence of your job search. If you succeed in finding a new job but it pays less than the job you lost, you may be entitled to the difference in pay. Therefore, it is necessary to keep all evidence of your job search even if you find another job.

In addition to looking for work, you should keep good records of your job search so you can prove that you have tried to find a comparable job. If you are out of work because of discrimination, be sure to save *all* documents and communications, including e-mails, relating to your job search.

---

### ➢ *WHAT ARE RECORDS OF YOUR JOB SEARCH?*

The following types of information can prove that you have tried to find work:
- copies of job applications and resumes

- a list of all the companies you contact about jobs by phone, letter or in-person

- copies of e-mails or letters that you send to or receive from companies where you have asked about work or submitted an application

- a list all of the places where you apply and for each one,
  a. the date of the application;
  b. the position you were seeking;
  c. the response you received from your application, such as rejection letters or invitations to interview;
  d. whether you were interviewed and the date of the interview;
  e. the results of the interview;
  f. whether you turned down a job offer, and if you did, why

- notes about what you did to look for work (for example, searching the newspaper or Internet or contacting employment agencies) and the dates that you conduct the search

- copies of your pay stubs or earnings records if you find another job.

If you have questions about what you are required to do, please contact your investigator.

---

### ➢ *KEEP US INFORMED*

Once you file a charge with the EEOC, you must tell us if you move or get a new address, telephone number, or e-mail address. We may need to talk to you to get more information. If the EEOC cannot reach you to get necessary information, your charge may be dismissed.

### ➢ *CALL IF YOU HAVE QUESTIONS*

Your investigator will discuss with you the documents and other evidence we need to investigate your charge. If you have any questions, or for inquiries about the status of your case, please contact your investigator directly or call 1-800-669-4000.

## EEOC Online Charge Status System Tip Sheet

Find out about the status of your charge of discrimination any time, day or night, using the EEOC Online Charge Status System. The system is available for charges that were filed on or after September 2, 2015.

- Access the Online Charge Status System via this link https://publicportal.eeoc.gov/portal/ or select the "My Charge Status" button on www.eeoc.gov.

- Enter your assigned charge number (found in the upper right hand corner on your discrimination charge form) and your zip code (as it appears on your discrimination charge form) to sign in. (If you have provided a new address and zip code to EEOC, use the new zip code.) You will be asked to enter a security code displayed in a box on the sign-in screen that is provided to assure additional security for the system.

- After you have signed into the Online Charge Status System, you will see the screen display pictured below. The numbers on the screen shot refer to the features explained beneath it.*



1. A quick view of the stage in the process at which your charge is currently.
2. The name and contact information of the EEOC staff member assigned to your charge or a note that your charge is pending assignment.
3. The EEOC office (and its address) that is handling your charge.
4. The specific actions the EEOC has taken on your charge, numbered sequentially, and the date of each action. (hold cursor over each action to read further details about the task).
5. The general steps in the process, with additional explanations that display when you hold your cursor over a colored box.
6. The range of next steps possible in the investigative process, which pops up when the cursor is held over this box.
7. The flow of the overall investigative process, which comes up when you click on this box.
8. Ends your session on the Online Charge Status System.

*Not every stage of the enforcement process will display for every charge, as each charge follows the process most appropriate to the facts in the charge and the stages of the investigation.

Keep in mind that the EEOC process takes time, so there will be gaps between entries about your charge in the Online Charge Status System. Even when you do not see any change in the status of your charge, EEOC staff are hard at work.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | ████████ |

| **Pennsylvania Human Relations Commission** | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| ████████████ | ████ | ████ |

| Street Address | City, State and ZIP Code |
|---|---|
| c/o Friends of Farmworkers, 699 Ranstead Street, 4th Floor, Philadelphia, PA 19106 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Ramada Hazleton | 5–15 | 570-455-2061 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1221 North Church Street | Hazleton, PA 18202 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Hazleton First, Inc. | 5–15 | 570-455-2061 |

| Street Address | City, State and ZIP Code |
|---|---|
| Route 309 N, Rural Route 2, Box 28 | Hazelton, PA 18201 |

| Name | No Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Wyndham Hotel Group | >100 | 973-753-6000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 22 Sylvan Way | Parsippany, NJ 07054 |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER (Specify) | Earliest: **April 2013**   Latest: **June 2, 2017**<br><br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a Latina woman of Dominican national origin. From April 2013 to June 2, 2017, I worked as a housekeeper at the Ramada hotel in Hazleton, Pennsylvania. Upon information and belief, the Ramada Hazleton is owned by Hazleton First, Inc. and is a franchise of the Wyndham Hotel Group. During my employment, I was harassed and discriminated against by my supervisor because of my sex. Specifically, I was sexually assaulted numerous times by my direct supervisor at the workplace and during work hours. I also experienced threats of retaliation if I attempted to report this behavior.

While I was employed by Ramada, I spent the majority of each day working on my own and cleaning individual hotel rooms. There were occasionally one or two other housekeepers that also assisted with the housekeeping and laundry, but we each generally worked on different floors. My direct supervisor was Pratap Bonepalli (male, Asian), whom I knew as "Patrick."

Even though Mr. Bonepalli did not speak very much Spanish, and I do not speak very much English, we got to know each other over the course of my time there. He would frequently me ask about my family, including my husband and children. At first this was friendly, but over time his questions began to make me feel very uncomfortable. For example, sometimes he made strange jokes asking me how many husbands he thought I had. He also frequently reminded me that he knew my family depended on my income, and they would suffer if I were unable to continue working there.

(continued on next page...)

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|

*State or local Agency, if any*

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Mr. Bonepalli lived in New Jersey, but he had a room in the hotel where he would stay overnight during the week. He generally prohibited employees from entering this room, but one of my job responsibilities was to go in and clean this room once a week. Sometimes he would come into the room while I was cleaning. On one of these occasions in March or April 2017, Mr. Bonepalli entered the room while I was cleaning, and he closed and locked the door. He then grabbed me, and even though I tried to resist, he raped me. Afterward, he told me not to tell anyone.

Mr. Bonepalli threatened me on several occasions that I would suffer terrible consequences if I reported him. Among other things, he told me that if I reported him, he would lose his job, and "If I can't work, you can't work either." He also asked me "What would your family do without you?" I took these comments to mean that if I reported his actions I would lose my job. I pointed out that there were security cameras in the hallway outside of his room, but he told me "I'm not stupid" and indicated he had turned them off. I was therefore convinced that I could not prove what he had done. I was so scared and ashamed that at first I did not even report this incident to my own family.

The Ramada Hazleton provided no mechanism for me to report the incident that did not involve reporting to Mr. Bonepalli himself. I was never given an employee handbook with policies for reporting harassment, nor was I ever explained any hotel policies regarding such behavior. There were a few other employees that worked in the front office, but none of them had authority over Mr. Bonepalli. I had previously met the owner of the hotel, Mr. Nataraj Pothireddy (male, Asian), but I was not able to report to him because he did not speak Spanish, and he also lived in New Jersey and only came to the hotel occasionally to check in. I also believed Mr. Pothireddy to be a family member of Mr. Bonepalli, and as a result, I did not have confidence that he would take any corrective action.

I tried to avoid Mr. Bonepalli at work, but it was impossible. Mr. Bonepalli sexually assaulted me in his room numerous times over the next several months. The last incident was on June 2, 2017. He assaulted me again in his room, but I managed to run out of the room, and another female employee found me crying in the laundry room. I told her my son's school had called and he was in trouble, so I needed to leave, and she helped me call a taxi to take me home. After that, Mr. Bonepalli called my home incessantly over the next three days. Eventually my husband picked up the phone, and Mr. Bonepalli put one of the front office employees on the phone to ask how my children were doing. My husband told her they were fine, but I would not be coming back to work. Mr. Bonepalli's behavior altered my working conditions so severely and made the workplace so unbearable that I was compelled to leave my employment and not return.

Instead, I decided to report Mr. Bonepalli's actions to the police. After doing so, I received a phone call from Luis, a man who occasionally performed maintenance at the Ramada Hazleton, and he told me that the owner, Mr. Pothireddy, requested that Luis call me and offer me money to drop the charges against Mr. Bonepalli. I told him I could not do that and I did not have control over the progress of the criminal investigation. This conversation confirmed my belief that had I previously reported Mr. Bonepalli's behavior to Mr. Pothireddy, he would not have taken sufficient corrective action to end the harassment and discrimination I was experiencing.

After I reported the crimes, I received a call from another female employee who worked in housekeeping at the hotel. She told me that she had also been sexually assaulted by Mr. Bonepalli at work. I did not know that any other women had experienced the same abuse until this woman called me. Mr. Bonepalli was arrested, and upon information and belief, he has been charged with multiple counts of rape and aggravated indecent assault for his actions toward me and this other woman employed by the Ramada hotel.

The Ramada hotel thus discriminated against me and other similarly-situated workers on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, and retaliated against us because of efforts to assert our rights under this statute.

(continued on next page...)

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br><br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:     Agency(ies) Charge No(s):<br><br>☐ FEPA<br>☒ EEOC |
|---|---|

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|

*State or local Agency, if any*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT |
| 11/16/17<br><br>Date          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**Information For Complainants & Election Option
To Dual File With The
Pennsylvania Human Relations Commission**

███████████████ v. HAZLETON FIRST INC.

EEOC Charge No. █████████████

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission (PHCR) under the Pennsylvania Human Relations Act. Filing your charge with the PHRC protects your state rights, especially since there may be circumstances in which state and federal laws and procedures vary in manner which could affect the outcome of your case.

Complaints filed with PHRC must be filed within 180 days of the act(s) which you believe are unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be dismissed.

If you want your charge filed with PHRC, including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC. You have chosen EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to file a request for preliminary hearing with PHRC

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency, the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year of filing with PHRC, you have the right to file your complaint in state court. PHRC will inform you of these rights and obligations at that time.

**[Sign and date appropriate request below]**

I want my charge filed with PHRC. I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to PHRC.

*I understand that false statements in this complaint are made subject to the penalties of 18 Pa.C.S. §4909, relating to unsworn falsification to authorities.*

<u>As stated by CP's attorney on 11/16/2017</u>
Signature and Date

*I do not want my charge dual filed with PHRC.*

_____/_____
Signature and Date



**U.S. Equal Employment Opportunity Commission**
**Philadelphia District Office**

801 Market Street
Suite 1300
Philadelphia, PA 19107
(215) 440-2602
TDD: 1-800-669-6820
Fax: (215) 440-2604
1-800-669-4000

Respondent: WYNDHAM HOTEL GROUP
EEOC Charge No.: ▮▮▮▮▮▮▮▮
FEPA Charge No.:

March 14, 2018

▮▮▮▮▮▮▮▮▮▮▮▮
C/O Friends Of Farmworkers
699 Ranstead Street, 4th Floor
Philadelphia, PA 19106

Dear Ms. ▮▮▮▮▮▮▮ :

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

| | |
|---|---|
| [X] | Title VII of the Civil Rights Act of 1964 (Title VII) |
| [ ] | The Age Discrimination in Employment Act (ADEA) |
| [ ] | The Americans with Disabilities Act (ADA) |
| [ ] | The Equal Pay Act (EPA) |
| [ ] | The Genetic Information Nondiscrimination Act (GINA) |

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

Please be aware that we will send a copy of the charge to Pennsylvania Human Relations Commission 333 Market Street Floor 8 Harrisburg, PA 17126 as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

The quickest and most convenient way to obtain the contact information and the status of your charge is to use EEOC's Online Charge Status System, which is available 24/7. You can access the system via this link (https://publicportal.eeoc.gov/portal) or by selecting the "My Charge Status" button on EEOC's Homepage (www.eeoc.gov). To sign in, enter your EEOC charge number, your zip code and the security response. An informational brochure is enclosed that provides more information about this system and its features.

While your charge is pending, please notify us of any change in your address, or where you can be reached if you have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Dilip Gokhale
Investigator
(215) 440-2634

www.eeoc.gov

Enclosure(s):



# WHAT YOU SHOULD DO
## AFTER YOU HAVE FILED A CHARGE WITH EEOC

> ### *KEEP YOUR DOCUMENTS – BOTH PAPER AND ELECTRONIC*

Now that you have filed an EEOC charge, you must keep anything that might be evidence related to your charge. This includes *all* documents, communications, and electronic information that are potentially related to your EEOC charge, including the harm caused by the discrimination, and all records of your communications with the EEOC. Even if you are not sure whether the information is relevant to your discrimination claim, please do not throw it away or delete it.

> ### *WHAT INFORMATION MUST YOU KEEP?*
> - **Paper documents**, such as:
>     - Employee manuals, pay stubs, work schedules
>     - Letters, memos, your notes
>     - Pictures, drawings, charts, whether or not they contain words
> - **Electronic information**, such as:
>     - E-mails, text messages, tweets, and social media posts and pictures
>     - Voice messages, video and sound recordings
>     - Word processing documents, electronic calendar entries
> - **Electronic memory on devices or the devices themselves**, such as:
>     - Memory on computers, laptops, tablets, cell phones
>     - Computers, laptops, tablets, cell phones
>     - Do not delete, replace, alter, "wipe," or "clear" your computer hard drive, electronic tablet, or cell phone, and do not change or remove Internet posts, without retaining an electronic copy. If you dispose of any old computers, phones or devices, make sure you make and keep an electronic copy of all potentially relevant information on the device.
> - These are some examples and not a complete list.
> - If you have questions about what you should or should not do, please contact your investigator.

*Why must you keep this information?* It might be evidence related to your charge. We are required by the courts to ensure that all potentially relevant information is retained. **Please note that failure to keep these records may cause you to lose your case, or to lose the right to recover money lost due to the discrimination.**

*What happens to your information?* Your investigator will discuss with you what information is needed by the EEOC to investigate your charge. Information that you provide that happens to be private or personal in nature will not be disclosed by the EEOC during its investigation, and if the EEOC files suit on your charge, we will do our best to keep such information out of the court proceedings.

*Please see page 2 for additional important information.*

## ➤ *LOOK FOR WORK IF YOU ARE OUT OF WORK*

If you lost your job or were not hired due to discrimination, you may be entitled to the pay or wages you lost. However, you cannot receive lost wages unless you can show that you looked for another job to replace the one you lost or were denied due to discrimination. In order to prove you searched for work, you must keep copies of all letters, emails, or other evidence of your job search. If you succeed in finding a new job but it pays less than the job you lost, you may be entitled to the difference in pay. Therefore, it is necessary to keep all evidence of your job search even if you find another job.

In addition to looking for work, you should keep good records of your job search so you can prove that you have tried to find a comparable job. If you are out of work because of discrimination, be sure to save *all* documents and communications, including e-mails, relating to your job search.

---

### ➤ *WHAT ARE RECORDS OF YOUR JOB SEARCH?*

The following types of information can prove that you have tried to find work:
- copies of job applications and resumes

- a list of all the companies you contact about jobs by phone, letter or in-person

- copies of e-mails or letters that you send to or receive from companies where you have asked about work or submitted an application

- a list all of the places where you apply and for each one,
  a. the date of the application;
  b. the position you were seeking;
  c. the response you received from your application, such as rejection letters or invitations to interview;
  d. whether you were interviewed and the date of the interview;
  e. the results of the interview;
  f. whether you turned down a job offer, and if you did, why

- notes about what you did to look for work (for example, searching the newspaper or Internet or contacting employment agencies) and the dates that you conduct the search

- copies of your pay stubs or earnings records if you find another job.

If you have questions about what you are required to do, please contact your investigator.

---

### ➤ *KEEP US INFORMED*

Once you file a charge with the EEOC, you must tell us if you move or get a new address, telephone number, or e-mail address. We may need to talk to you to get more information. If the EEOC cannot reach you to get necessary information, your charge may be dismissed.

### ➤ *CALL IF YOU HAVE QUESTIONS*

Your investigator will discuss with you the documents and other evidence we need to investigate your charge. If you have any questions, or for inquiries about the status of your case, please contact your investigator directly or call 1-800-669-4000.

Page 2

## EEOC Online Charge Status System Tip Sheet

Find out about the status of your charge of discrimination any time, day or night, using the EEOC Online Charge Status System. The system is available for charges that were filed on or after September 2, 2015.

- Access the Online Charge Status System via this link https://publicportal.eeoc.gov/portal/ or select the "My Charge Status" button on www.eeoc.gov.

- Enter your assigned charge number (found in the upper right hand corner on your discrimination charge form) and your zip code (as it appears on your discrimination charge form) to sign in. (If you have provided a new address and zip code to EEOC, use the new zip code.) You will be asked to enter a security code displayed in a box on the sign-in screen that is provided to assure additional security for the system.

- After you have signed into the Online Charge Status System, you will see the screen display pictured below. The numbers on the screen shot refer to the features explained beneath it.*



1. A quick view of the stage in the process at which your charge is currently.
2. The name and contact information of the EEOC staff member assigned to your charge or a note that your charge is pending assignment.
3. The EEOC office (and its address) that is handling your charge.
4. The specific actions the EEOC has taken on your charge, numbered sequentially, and the date of each action. (hold cursor over each action to read further details about the task).
5. The general steps in the process, with additional explanations that display when you hold your cursor over a colored box.
6. The range of next steps possible in the investigative process, which pops up when the cursor is held over this box.
7. The flow of the overall investigative process, which comes up when you click on this box.
8. Ends your session on the Online Charge Status System.

*Not every stage of the enforcement process will display for every charge, as each charge follows the process most appropriate to the facts in the charge and the stages of the investigation.

Keep in mind that the EEOC process takes time, so there will be gaps between entries about your charge in the Online Charge Status System. Even when you do not see any change in the status of your charge, EEOC staff are hard at work.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Pennsylvania Human Relations Commission | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| ███████████████ | ██████ | ██████ |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| c/o Friends of Farmworkers, 699 Ranstead Street, 4th Floor, Philadelphia, PA 19106 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Ramada Hazleton | 5–15 | 570-455-2061 |
| Street Address | City, State and ZIP Code | |
| 1221 North Church Street | Hazleton, PA 18202 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Hazleton First, Inc. | 5–15 | 570-455-2061 |
| Street Address | City, State and ZIP Code | |
| Route 309 N, Rural Route 2, Box 28 | Hazelton, PA 18201 | |

| Name | No Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Wyndham Hotel Group | >100 | 973-753-6000 |
| Street Address | City, State and ZIP Code | |
| 22 Sylvan Way | Parsippany, NJ 07054 | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **April 2013**  Latest: **June 2, 2017**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a Latina woman of Dominican national origin. From April 2013 to June 2, 2017, I worked as a housekeeper at the Ramada hotel in Hazleton, Pennsylvania. Upon information and belief, the Ramada Hazleton is owned by Hazleton First, Inc. and is a franchise of the Wyndham Hotel Group. During my employment, I was harassed and discriminated against by my supervisor because of my sex. Specifically, I was sexually assaulted numerous times by my direct supervisor at the workplace and during work hours. I also experienced threats of retaliation if I attempted to report this behavior.

While I was employed by Ramada, I spent the majority of each day working on my own and cleaning individual hotel rooms. There were occasionally one or two other housekeepers that also assisted with the housekeeping and laundry, but we each generally worked on different floors. My direct supervisor was Pratap Bonepalli (male, Asian), whom I knew as "Patrick."

Even though Mr. Bonepalli did not speak very much Spanish, and I do not speak very much English, we got to know each other over the course of my time there. He would frequently me ask about my family, including my husband and children. At first this was friendly, but over time his questions began to make me feel very uncomfortable. For example, sometimes he made strange jokes asking me how many husbands he thought I had. He also frequently reminded me that he knew my family depended on my income, and they would suffer if I were unable to continue working there.

(continued on next page...)

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Mr. Bonepalli lived in New Jersey, but he had a room in the hotel where he would stay overnight during the week. He generally prohibited employees from entering this room, but one of my job responsibilities was to go in and clean this room once a week. Sometimes he would come into the room while I was cleaning. On one of these occasions in March or April 2017, Mr. Bonepalli entered the room while I was cleaning, and he closed and locked the door. He then grabbed me, and even though I tried to resist, he raped me. Afterward, he told me not to tell anyone.

Mr. Bonepalli threatened me on several occasions that I would suffer terrible consequences if I reported him. Among other things, he told me that if I reported him, he would lose his job, and "If I can't work, you can't work either." He also asked me "What would your family do without you?" I took these comments to mean that if I reported his actions I would lose my job. I pointed out that there were security cameras in the hallway outside of his room, but he told me "I'm not stupid" and indicated he had turned them off. I was therefore convinced that I could not prove what he had done. I was so scared and ashamed that at first I did not even report this incident to my own family.

The Ramada Hazleton provided no mechanism for me to report the incident that did not involve reporting to Mr. Bonepalli himself. I was never given an employee handbook with policies for reporting harassment, nor was I ever explained any hotel policies regarding such behavior. There were a few other employees that worked in the front office, but none of them had authority over Mr. Bonepalli. I had previously met the owner of the hotel, Mr. Nataraj Pothireddy (male, Asian), but I was not able to report to him because he did not speak Spanish, and he also lived in New Jersey and only came to the hotel occasionally to check in. I also believed Mr. Pothireddy to be a family member of Mr. Bonepalli, and as a result, I did not have confidence that he would take any corrective action.

I tried to avoid Mr. Bonepalli at work, but it was impossible. Mr. Bonepalli sexually assaulted me in his room numerous times over the next several months. The last incident was on June 2, 2017. He assaulted me again in his room, but I managed to run out of the room, and another female employee found me crying in the laundry room. I told her my son's school had called and he was in trouble, so I needed to leave, and she helped me call a taxi to take me home. After that, Mr. Bonepalli called my home incessantly over the next three days. Eventually my husband picked up the phone, and Mr. Bonepalli put one of the front office employees on the phone to ask how my children were doing. My husband told her they were fine, but I would not be coming back to work. Mr. Bonepalli's behavior altered my working conditions so severely and made the workplace so unbearable that I was compelled to leave my employment and not return.

Instead, I decided to report Mr. Bonepalli's actions to the police. After doing so, I received a phone call from Luis, a man who occasionally performed maintenance at the Ramada Hazleton, and he told me that the owner, Mr. Pothireddy, requested that Luis call me and offer me money to drop the charges against Mr. Bonepalli. I told him I could not do that and I did not have control over the progress of the criminal investigation. This conversation confirmed my belief that had I previously reported Mr. Bonepalli's behavior to Mr. Pothireddy, he would not have taken sufficient corrective action to end the harassment and discrimination I was experiencing.

After I reported the crimes, I received a call from another female employee who worked in housekeeping at the hotel. She told me that she had also been sexually assaulted by Mr. Bonepalli at work. I did not know that any other women had experienced the same abuse until this woman called me. Mr. Bonepalli was arrested, and upon information and belief, he has been charged with multiple counts of rape and aggravated indecent assault for his actions toward me and this other woman employed by the Ramada hotel.

The Ramada hotel thus discriminated against me and other similarly-situated workers on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, and retaliated against us because of efforts to assert our rights under this statute.

(continued on next page…)

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

**Pennsylvania Human Relations Commission** and EEOC

*State or local Agency, if any*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT |
| 11/16/17<br><br>Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

**Information For Complainants & Election Option
To Dual File With The
Pennsylvania Human Relations Commission**

████████████████ v. WYNDHAM HOTEL GROUP

EEOC Charge No. ████████

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission (PHCR) under the Pennsylvania Human Relations Act. Filing your charge with the PHRC protects your state rights, especially since there may be circumstances in which state and federal laws and procedures vary in manner which could affect the outcome of your case.

Complaints filed with PHRC must be filed within 180 days of the act(s) which you believe are unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be dismissed.

If you want your charge filed with PHRC, including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with PHRC. You have chosen EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to file a request for preliminary hearing with PHRC

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency, the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year of filing with PHRC, you have the right to file your complaint in state court. PHRC will inform you of these rights and obligations at that time.

**[Sign and date appropriate request below]**

I want my charge filed with PHRC. I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to PHRC.

*I understand that false statements in this complaint are made subject to the penalties of 18 Pa.C.S. §4909, relating to unsworn falsification to authorities.*

As stated by CP's attorney on 11/16/2017
Signature and Date

*I do not want my charge dual filed with PHRC.*

_____/_____
Signature and Date

# Exhibit C to Complaint

# Right to Sue Letter, *with identifying information redacted*

EEOC Form 161-A (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE
### (CONCILIATION FAILURE)

| To: | From: |
|---|---|
| ███████████ Justice at Work 990 Spring Garden, Suite 300 Philadelphia, PA 19123 | Philadelphia District Office 801 Market Street Suite 1300 Philadelphia, PA 19107 |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2018-00885 | Legal Technician | (215) 440-2828 |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_Jamie R. Williamson (signature)_

December 12, 2018

Enclosures(s)

**Jamie R. Williamson,**
**District Director**

*(Date Mailed)*

cc:   Nataraj Pothireddy
      Owner
      RAMADA HAZLETON
      1221 N Church Street
      Hazle Townshp, PA 18202

      Chelsea Edwards, Esq.
      C/O JUSTICE AT WORK
      990 Spring Garden
      Suite 300
      Philadelphia, PA 19123

Enclosure with EEOC
Form 161-A (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit D to Complaint

Luzerne County Court of Common Pleas Docket Report for case CP-40-CR-0002516-2017

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

## CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 1 of 7

### CASE INFORMATION

| | |
|---|---|
| Judge Assigned: Vough, Michael T. | Date Filed: 07/21/2017    Initiation Date: 06/20/2017 |
| OTN: T 938936-5    LOTN: | Originating Docket No: MJ-11304-CR-0000191-2017 |
| Initial Issuing Authority: James M. Dixon | Final Issuing Authority: James M. Dixon |
| Arresting Agency: PSP - Hazleton | Arresting Officer: Quiroz, James D. |
| Complaint/Incident #: 2017585103 | |
| Case Local Number Type(s) | Case Local Number(s) |

### STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | Arrest Date: | 06/20/2017 |
|---|---|---|---|---|---|
| | | 06/26/2018 | Sentenced/Penalty Imposed | | |
| | | 06/26/2018 | Awaiting Sentencing | | |
| | | 10/02/2017 | Awaiting Trial | | |
| | | 07/21/2017 | Awaiting Formal Arraignment | | |
| | | 07/21/2017 | Awaiting Filing of Information | | |

Complaint Date:    06/20/2017

### CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment | 10/05/2017 | 10:00 am | Luzerne County Courthouse, 3rd Floor | Judge Michael T. Vough | Scheduled |
| Trial - Jury Ready | 06/25/2018 | 9:00 am | Luzerne County Courthouse, 3rd Floor | Judge Michael T. Vough | Moved |
| Trial - Jury Ready | 06/26/2018 | 9:00 am | Luzerne County Courthouse, 3rd Floor | Judge Michael T. Vough | Scheduled |

### CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|
| 06/27/2017 | County Jail | Luzerne County Prison | | Yes |

### DEFENDANT INFORMATION

| | | |
|---|---|---|
| Date Of Birth: | 09/03/1979 | City/State/Zip: Iselin, NJ 08830 |

### CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Bonepalli, Pratap |

CPCMS 9082

Printed: 03/11/2019

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

| DOCKET |
|---|



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 2 of 7

## BAIL INFORMATION

Bonepalli, Pratap                                                                                 Nebbia Status: None

| Bail Action | Date | Bail Type | Percentage | Amount | |
|---|---|---|---|---|---|
| | | | | | Bail Posting Status  Posting Date |
| Denied | 06/20/2017 | | | $0.00 | |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | F1 | 18 § 3121 §§A1 | Rape Forcible Compulsion | 04/06/2017 | T 938936-5 |
| 2 | 2 | F2 | 18 § 3125 §§A1 | Agg. Ind. Assault W/O Consent | 04/06/2017 | T 938936-5 |
| 3 | 3 | M2 | 18 § 3126 §§A1 | Indec Asslt-W/O Cons Of Other | 04/06/2017 | T 938936-5 |
| 4 | 4 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 5 | 16 | F1 | 18 § 3123 §§A2 | IDSI Threat Forcible Compulsion | 04/06/2017 | T 938936-5 |
| 6 | 10 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |
| 99999 | 5 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 99999 | 6 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 99999 | 7 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 99999 | 8 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 99999 | 9 | M2 | 18 § 3127 §§A | Indecent Exposure | 04/06/2017 | T 938936-5 |
| 99999 | 11 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |
| 99999 | 12 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |
| 99999 | 13 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |
| 99999 | 14 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |
| 99999 | 15 | S | 18 § 2709 §§A1 | Harassment - Subject Other to Physical Contact | 04/06/2017 | T 938936-5 |

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition | |
|---|---|---|---|
| Sequence/Description | Offense Disposition | Grade | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served | |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date | |
| Sentence Conditions | | | |

**Held for Court (Lower Court)**        Defendant Was Present

| Lower Court Disposition | 07/18/2017 | Not Final | |
|---|---|---|---|
| 1 / Rape Forcible Compulsion | Held for Court (Lower Court) | F1 | 18 § 3121 §§ A1 |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

### Court Case

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 3 of 7

## DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event Sequence/Description Sentencing Judge Sentence/Diversion Program Type Sentence Conditions | Disposition Date Offense Disposition Sentence Date Incarceration/Diversionary Period | Final Disposition Grade Section Credit For Time Served Start Date | | |
|---|---|---|---|---|
| 2 / Agg. Ind. Assault W/O Consent | Held for Court (Lower Court) | F2 | 18 § 3125 §§ A1 | |
| 3 / Indec Asslt-W/O Cons Of Other | Held for Court (Lower Court) | M2 | 18 § 3126 §§ A1 | |
| 4 / Indecent Exposure | Held for Court (Lower Court) | M2 | 18 § 3127 §§ A | |
| 5 / IDSI Threat Forcible Compulsion | Held for Court (Lower Court) | F1 | 18 § 3123 §§ A2 | |
| 6 / Harassment - Subject Other to Physical Contact | Held for Court (Lower Court) | S | 18 § 2709 §§ A1 | |
| 99,999 / Harassment - Subject Other to Physical Contact | Held for Court (Lower Court) | S | 18 § 2709 §§ A1 | |
| 99,999 / Indecent Exposure | Held for Court (Lower Court) | M2 | 18 § 3127 §§ A | |
| **Proceed to Court**    Defendant Was Not Present | | | | |
| Information Filed | 09/21/2017 | Not Final | | |
| 1 / Rape Forcible Compulsion | Held for Court | F1 | 18 § 3121 §§ A1 | |
| 2 / Agg. Ind. Assault W/O Consent | Held for Court | F2 | 18 § 3125 §§ A1 | |
| 3 / Indec Asslt-W/O Cons Of Other | Held for Court | M2 | 18 § 3126 §§ A1 | |
| 4 / Indecent Exposure | Held for Court | M2 | 18 § 3127 §§ A | |
| 5 / IDSI Threat Forcible Compulsion | Held for Court | F1 | 18 § 3123 §§ A2 | |
| 6 / Harassment - Subject Other to Physical Contact | Held for Court | S | 18 § 2709 §§ A1 | |
| 99,999 / Harassment - Subject Other to Physical Contact | Withdrawn | S | 18 § 2709 §§ A1 | |
| 99,999 / Indecent Exposure | Withdrawn | M2 | 18 § 3127 §§ A | |
| **Guilty Plea** | | | | |
| Trial - Jury Ready | 06/26/2018 | Final Disposition | | |
| 1 / Rape Forcible Compulsion | Withdrawn | F1 | 18 § 3121 §§ A1 | |
| Vough, Michael T. | 06/26/2018 | | | |
| 2 / Agg. Ind. Assault W/O Consent | Guilty Plea | F2 | 18 § 3125 §§ A1 | |
| Vough, Michael T. | 06/26/2018 | 365 Days | | |
| Confinement | Min of 10.00 Months Max of 23.00 Months 29.00 Days Other | | | |
| 3 / Indec Asslt-W/O Cons Of Other | Withdrawn | M2 | 18 § 3126 §§ A1 | |
| Vough, Michael T. | 06/26/2018 | | | |
| 4 / Indecent Exposure | Withdrawn | M2 | 18 § 3127 §§ A | |
| Vough, Michael T. | 06/26/2018 | | | |

CPCMS 9082

Printed: 03/11/2019

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 4 of 7

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event<br>Sequence/Description<br>Sentencing Judge<br>Sentence/Diversion Program Type<br>Sentence Conditions | Disposition Date<br>Offense Disposition<br>Sentence Date<br>Incarceration/Diversionary Period | Final Disposition<br>Grade    Section<br>Credit For Time Served<br>Start Date |
|---|---|---|
| 5 / IDSI Threat Forcible Compulsion | Withdrawn | F1    18 § 3123 §§ A2 |
| Vough, Michael T. | 06/26/2018 | |
| 6 / Harassment - Subject Other to Physical Contact | Withdrawn | S    18 § 2709 §§ A1 |
| Vough, Michael T. | 06/26/2018 | |
| 99,999 / Harassment - Subject Other to Physical Contact | Withdrawn | S    18 § 2709 §§ A1 |
| Vough, Michael T. | 06/26/2018 | |
| 99,999 / Indecent Exposure | Withdrawn | M2    18 § 3127 §§ A |
| Vough, Michael T. | 06/26/2018 | |

### COMMONWEALTH INFORMATION                    ATTORNEY INFORMATION

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:**    Brittany Quinn<br>        Assistant District Attorney | **Name:**    Nandakumar Palissery<br>        Private |
| **Supreme Court No:**    320530 | **Supreme Court No:**    073047 |
| **Phone Number(s):** | **Rep. Status:**    Active |
| 570-830-5173    (Phone) | **Phone Number(s):** |
| **Address:** | 570-331-4529    (Phone) |
| Luzerne County District Attorney's Office<br>200 N River St<br>Wilkes-Barre, PA 18701 | **Address:**<br>Palissery Law Offices<br>26 Pierce St<br>Kingston, PA 18704-4634 |
| | Representing: Bonepalli, Pratap |

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 06/20/2017 | | Dixon, James M. |
| Order Denying Motion to Set Bail - Bonepalli, Pratap | | | |
| 1 | 07/21/2017 | | Court of Common Pleas - Luzerne County |
| Original Papers Received from Lower Court | | | |
| 1 | 09/21/2017 | | Commonwealth of Pennsylvania |
| Information Filed | | | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 5 of 7

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 10/02/2017 | | Palissery, Nandakumar |
| Appearance and Waiver of Arraignment | | | |
| 1 | 10/13/2017 | | Vough, Michael T. |
| Court Order Filed Scheduling Case for Trial on January 8th,16th or 22nd 2018 @ 9:00 am | | | |
| 1 | 11/07/2017 | | Palissery, Nandakumar |
| Joint Case Management Plan | | | |
| 1 | 11/13/2017 | | Vough, Michael T. |
| Order Granting Motion for Continuance | | | |
| 1 | 01/24/2018 | | Palissery, Diane Marie |
| Entry of Appearance | | | |
| 1 | 02/13/2018 | | Palissery, Nandakumar |
| Motion for Continuance | | | |
| Quinn, Brittany | | | |
| 02/13/2018 | eService | | Served |
| 2 | 02/13/2018 | | Vough, Michael T. |
| Order Granting Continuance to the April, 2018, Trial Term.  Time runs against deft. for Rule 600. | | | |
| Palissery, Diane Marie | | | |
| 02/15/2018 | eService | | Served |
| Palissery, Nandakumar | | | |
| 02/15/2018 | eService | | Served |
| Quinn, Brittany | | | |
| 02/15/2018 | eService | | Served |
| 1 | 06/26/2018 | | Vough, Michael T. |
| Guilty Plea | | | |
| Palissery, Diane Marie | | | |
| 06/27/2018 | eService | | Served |
| Palissery, Nandakumar | | | |
| 06/27/2018 | eService | | Served |
| Quinn, Brittany | | | |
| 06/27/2018 | eService | | Served |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 6 of 7

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | | Service By | |
| Issue Date | Service Type | Status Date | Service Status |
| 2 | 06/26/2018 | | Luzerne County District Attorney's Office |
| Plea Agreement | | | |
| Palissery, Diane Marie | | | |
| 07/03/2018 | eService | | Served |
| Palissery, Nandakumar | | | |
| 07/03/2018 | eService | | Served |
| Quinn, Brittany | | | |
| 07/03/2018 | eService | | Served |
| 3 | 06/26/2018 | | Vough, Michael T. |
| Order - Sentence/Penalty Imposed | | | |
| COMPLY W/A TERMS AND CONDITIONS PER DISPOSITION SHEET | | | |
| Palissery, Diane Marie | | | |
| 07/11/2018 | eService | | Served |
| Palissery, Nandakumar | | | |
| 07/11/2018 | eService | | Served |
| Quinn, Brittany | | | |
| 07/11/2018 | eService | | Served |
| 1 | 07/11/2018 | | Court of Common Pleas - Luzerne County |
| Penalty Assessed | | | |

## PAYMENT PLAN SUMMARY

| Payment Plan No | Payment Plan Freq. | Next Due Date | Active | Overdue Amt |
|---|---|---|---|---|
| Responsible Participant | | | Suspended | Next Due Amt |
| 40-2018-P000003285 | Single Payment | 07/11/2018 | Yes | $1,241.15 |
| Bonepalli, Pratap | | | No | $1,241.15 |

| | Payment Plan History: | Receipt Date | Payor Name | Participant Role | Amount |
|---|---|---|---|---|---|

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF LUZERNE COUNTY

## DOCKET



**Docket Number: CP-40-CR-0002516-2017**

# CRIMINAL DOCKET

**Court Case**

Commonwealth of Pennsylvania

v.

Pratap Bonepalli

Page 7 of 7

### CASE FINANCIAL INFORMATION

| Last Payment Date: | | | | Total of Last Payment: | |
|---|---|---|---|---|---|
| **Bonepalli, Pratap**<br>  Defendant | Assessment | Payments | Adjustments | Non Monetary<br>Payments | Total |
| **Costs/Fees** | | | | | |
| ATJ | $4.00 | $0.00 | $0.00 | $0.00 | $4.00 |
| Automation Fee (LCAP) (Luzerne) | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| CJES | $2.25 | $0.00 | $0.00 | $0.00 | $2.25 |
| Clerk of Court Filing Fee (Luzerne) | $120.00 | $0.00 | $0.00 | $0.00 | $120.00 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $20.65 | $0.00 | $0.00 | $0.00 | $20.65 |
| Costs of Prosecution - CJEA | $50.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| County Court Cost (Act 204 of 1976) | $30.10 | $0.00 | $0.00 | $0.00 | $30.10 |
| Crime Victims Compensation (Act 96 of 1984) | $35.00 | $0.00 | $0.00 | $0.00 | $35.00 |
| DNA Detection Fund (Act 185-2004) | $250.00 | $0.00 | $0.00 | $0.00 | $250.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | $0.00 | $0.00 | $10.00 |
| Firearm Education and Training Fund | $5.00 | $0.00 | $0.00 | $0.00 | $5.00 |
| JCPS | $21.25 | $0.00 | $0.00 | $0.00 | $21.25 |
| Judicial Computer Project | $8.00 | $0.00 | $0.00 | $0.00 | $8.00 |
| State Court Costs (Act 204 of 1976) | $13.75 | $0.00 | $0.00 | $0.00 | $13.75 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | $0.00 | $0.00 | $25.00 |
| Costs of Transportation (Act 143-2006) | $41.15 | $0.00 | $0.00 | $0.00 | $41.15 |
| Costs/Fees Totals: | $641.15 | $0.00 | $0.00 | $0.00 | $641.15 |
| Grand Totals: | $641.15 | $0.00 | $0.00 | $0.00 | $641.15 |

** - Indicates assessment is subrogated

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in  18 Pa.C.S. Section 9183.

# Exhibit E to Complaint

# Franchise Agreement

Location: **Hazelton, PA**
Entity No.:82573
Unit No.: 11568

## RAMADA FRANCHISE SYSTEMS, INC.
## LICENSE AGREEMENT

This transaction involves the transfer of an existing Chain Facility at the Location first granted to **HAZELTON HOTEL ASSOCIATES**, ("Prior Licensee") in a License Agreement with us dated **August 26, 1998** (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Licensee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, RINA Services Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that you must pay a retraining fee to us for updating the Facility's property management information system.

THIS LICENSE AGREEMENT ("Agreement"), dated ___*12/17*___, 200*4*, is between **RAMADA FRANCHISE SYSTEMS, INC.**, a Delaware corporation ("we", "our" or "us"), and **HAZELTON FIRST, INC., a Pennsylvania corporation** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We acquired from Franchise Systems Holdings, Inc. ("FSH") pursuant to the Master License Agreements the right to use and to sublicense certain trade names, trademarks and service marks including the Marks and the distinctive Ramada System for providing transient guest lodging services to the public under the "RAMADA" name and certain services to its licensees, including the Reservation System, advertising, marketing and training services. We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Ramada Inn."** You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Ramada Inns National Association.**

**2.1 Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

1

RAMEXCI
164388 8/04

2.2 **RINA Conference.** You or your representative will attend each RINA Conference when it is held. You will pay not less than one "Conference Registration Fee" for each Facility you own. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 435 points within ninety (90) days after the Effective Date and 455 points (or equivalent scores under a successor quality assurance scoring system we employ), within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Opening.** You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

2

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You will participate in any regional management association ("RMA") of Chain licensees formed to provide regional marketing, training, and other benefits for Chain Facilities in your area. You will pay the RMA Fee described in Schedule C to support the RMA's activities, if and when levied.

3.6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs, including arrangements we make with third party distribution channels. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation

3

RAMEXCI
164388 8/04

agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

**3.8 Financial Books & Records; Audits.**

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the

4

applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Ramada Franchise Systems, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a RINA conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

5

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 455 points and the most recent quality assurance inspection score for the Facility was at least 435 points (or equivalent scores under a successor quality assurance scoring system we employ),  when the Facility is otherwise eligible for a Minor Renovation.

4.  **Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1  **Training.**  We will offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and

6

operating a Chain Facility. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after he/she assumes the position or 90 days after the Opening Date, whichever occurs first. If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place. Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $995 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines. For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

**4.1.2 Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 90 days after the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer than five days. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000. You must also pay your travel, lodging, meal and incidental expenses.

**4.1.3 On-Site Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial training program. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

**4.1.4 Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences. We may increase the tuition charge in the future. The length of the remedial

7

training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

**4.1.5 Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be held in our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. This training may be held in conjunction with a Chain Lodging conference. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

**4.1.6 Cancellation Fees.** We will charge you a cancellation fee of 50% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held. If you fail to attend a training program as scheduled without notifying us in advance, your cancellation fee will be 100% of the tuition for the program. These fees are non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

**4.2 Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

**4.3 Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from RINA Services Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

8

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We will publish the Chain Directory.  We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication.  We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements.  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4   **Purchasing.**  We may offer optional assistance to you with purchasing items used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5   **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6   **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7   **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications.  We will lend you one copy of the System Standards Manual promptly after we sign this Agreement.  We will send you any System Standards Manual revisions and/or supplements as and when issued.  We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8   **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.9.  We have the unlimited right to reinspect if the Facility does not achieve the score

9

RAMEXC1
164388 8/04

required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6. Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000. You will pay us a non-refundable Initial Fee in the amount of **$15,000.** when you sign this Agreement, which is fully earned when we sign this Agreement, as the Relicense Fee established under the Prior Agreement.

**7. Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the

10

RAMEXC1
164388 8/04


INITIAL
HERE

jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license

11

of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred

12

before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5  **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6  **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

10.  **Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

11.  **Default and Termination.**

11.1  **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual

13

amount shall be the average monthly Royalties and RINA Services Assessment Fees since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13. Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all

16

other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

**13.3 Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

**13.4 Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

**14.1 Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

**14.2 This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you

17

sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

**14.3 No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

**15.1 Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

**15.2 Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

**15.3 Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory defined in Section 17.8. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

**15.4 Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be

18

RAMEXCI
1643R8 8/04

limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including,

19

but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status.**   If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly.   The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

16.3   **FSH Rights.**   In the event our rights to (i) any of the Marks or the Ramada System shall be terminated pursuant to the Master License Agreements (other than as a result of a purchase option we exercise as set forth therein), or (ii) we liquidate, dissolve or otherwise cease to do business, then FSH or its assignee shall have the right to succeed to all of our rights in, to and under this Agreement and any other agreements between you and us entered into pursuant to this Agreement, and in such event FSH or its assignee shall be obligated to perform our duties and assume all of our obligations under any such agreements.

## 17.  Legal Matters.

17.1   **Partial Invalidity.**   If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.   If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.   Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.   All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below.   The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Franchise Systems, Inc.:
Our address:  1 Sylvan Way, P.O.  Box 278, Parsippany, New Jersey 07054-0278

20

RAMEXCI
164388 8/04

Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

Your name: **Hazelton First, Corp.,**
Your address: **RR 2 Box 28, Hazalton, PA 18202,**
Attention: **Attn: Mado Gadepalli;**
Your fax No.: **570-455-9387.**

**17.4 Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5 Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6 Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4 **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

21

RAMEXCI
164388 8/04

17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8  Protected Territory.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed.  The Protected Territory fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance.  The covenants in this Section are

22

RAMEXCI
164388 8/04

mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **an area within a circle created by a 3 (three) mile radius whose centerpoint is the front door of the Facility.**

**18.    Special Stipulations.**    The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1  **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the 7th anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores worse than 455 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 455 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

**18.2    Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the 7th anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.3.  **Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the RINA Services Assessment Fee (excluding commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

23

INITIAL
HERE

18.4.1  The Combined Fee shall be six and a half percent (6.5%) of Gross Room Revenues accruing during the first ans second  License Years; and

18.4.2  The Royalty and RINA Services Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the second License Year.

18.4.3   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 455 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 455 in a reinspection to be performed not less than 60 days after the initial inspection.

24 A

RAMEXC1
164388 8/04



INITIAL
HERE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**RAMADA FRANCHISE SYSTEMS, INC.**

By:_____
    Richard Saltzman
    Vice President
    Franchise Administration

Attest:_____
            Assistant Secretary

            JEFFREY I. BURNETT
    GROUP VICE PRESIDENT - LEGAL
                  AND
        ASSISTANT SECRETARY

**YOU, as licensee:**
**HAZELTON FIRST, INC.**

By:_____
    (Vice) President

Attest:__·/· Polniarely·___

24 B

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

25

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and

26

entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **RR 2 Box 28, Route 309 N., Hazelton, PA 18202,** as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

27

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Minor Renovation</u> means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Relicense Fee</u> means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

28

RAMEXCI
164388 8/04

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation Service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

29

RAMEXCI
164388 8/04

<u>Termination</u> means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

<u>Transfer</u> means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

<u>"You" and "Your"</u> means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

<u>"We", "Our" and "Us"</u> means and refers to Ramada Franchise Systems, Inc., a Delaware corporation, its successors and assigns.

30

# SCHEDULE A

## (Legal Description of Facility)

RAMEXCI
164388 8/04

01/04/2005  03:42   9733319390          EDGE TECHNOLOGIES IN          PAGE  02

# Ci...CAGO TITLE INSURANCE COMPANY

### File Number: PCT-5447

### SCHEDULE C
### LEGAL DESCRIPTION

All that certain Lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Hazel, County of Luzerne State of Pennsylvania:

ALL THAT CERTAIN piece or parcel of land situate in Hazle Township, Country of Luzerne and State of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point, an iron pin at the northeast corner of the lands herein described and located South eighty-one degrees fifty-four minutes zero seconds East (S 81 degrees 54' 00" E.) one hundred eighty and zero hundredths (180.00') feet from a brown set stone monument located on the west boundary of the James Latimore Warrantee Tract.

THENCE, through the said James Latimore Tract the following two (2) courses and distances : (1) South five degrees twenty-nine minutes twenty seconds West (S 05 degrees 29' 20" W) two hundred and zero hundredths (200.00') feet to a point ,being an iron pin; (2) South eleven degrees fifty seven minutes forty seconds East (S 11 degrees 57' 40" E.) one hundred ninety-nine and ten hundredths(199.10') feet to a point, being an iron pin;

THENCE, in a westerly direction through the lands of said James Latimore Tract, recorded in Deed Book 1471, Page 662, thence continuing through the lands of the Matthew Eggert Warranties Tract of the portion containing 7.522 acres, and recorded in Deed Book 1304, Page 622, thence continuing through the lands as recorded in Deed Book 1088 Page 387; said line being South eighty-seven degrees eighteen minutes twenty seconds West (S 87 degrees 18' 20" W) eight hundred thirty-five and ninety-one hundredths (835.91') feet to a point, being an iron pin on a line common to the east line of North Church Street and the west line of said lands recorded in Deed Book 1088, Page 387;

THENCE in a northerly direction on a line common to the east line of North Church Street and west line of said lands recorded in Deed Book 1088, Page 387 , the lands of Matthew Eggert Warrantee Tract and the lands as recorded in Deed Book 1232, Page 414, said line being North two degrees forty-one minutes forty seconds East( N 02 degrees 41' 40 "E) three hundred twenty-five and zero hundredths (325.00) feet to a point, being an iron pin located sixty-four (64') feet northward along the east side of North Church Street from the northeast corner of North Church and Thirthirtieth Streets:

THENCE, In an easterly direction on the north line of lands as recorded in deed Book 1232 ,Page 414, North eighty - seven degrees eighteen minutes twenty seconds East (N.87 degrees 18' 20" E) two hundred fifteen and zero hundredths (215.00) feet to a point,being a iron pin;

THENCE, in a northerly direction North two degrees forty-one minutes forty seconds West (N.02 degrees 41' 40" W) one hundred eighty six and five hundredths(186.05') feet to a point, being an iron pin in the north line of the Matthew Eggert Warrantee Tract.

THENCE, in an easterly direction along the north line of Matthew  Eggert Warrantee Tract lands South Eighty one degrees Fifty four minutes zero seconds East (S 81 degrees 54'00" E) four hundred forty three and thirteen hundredths (443.13') feet , to the brown set stone monument and then continuing on the same South Eighty one degrees fifty four minutes zero seconds East (S 81 degrees 54' 00" E) one hundred eighty and zero hundredths feet (180.00) to the place of beginning.

## SECOND THEREOF

ALL THAT CERTAIN piece of parcel of land situate in Hazle Township, County of Luzerne and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

| PAGE 1          JAN-4-05 3:43PM;          7325487514;          !0318 13r8385 dH :A8 1N38

01/04/2005  03:42    9733319398          EDGE TECHNOLOGIES IN          PAGE  03

# ChiCAGO TITLE INSURANCE CUMPANY

BEGINNING at a point, an iron pin at the northwest corner of the lands herein described and located in the East line of north Church Street South two degrees forty one minutes forty seconds East (S 02 degrees 41' 40" E) Three hundred twenty five and zero hundredths (325.00) feet from an iron pin located sixty-four (64) foot Northward along the East side of North Church Street from the northeast corner of North Church Strcet and Thirtieth Streets.

THENCE, in an easterly direction through the lands as recorded in Deed Book 1088, Page 387 ,thence continuing through the lands of Matthew Eggert Warrantee Tract of the portion containing seven and five hundred twenty two thousandths (7.522) acres, and recorded in Deed Book 1304 ,Page 622, thence through the lands of the James Latimore Tract, recorded in Deed Book 1471, Page 622 ,said line being North eigthy seven degrees eighteen minutes twenty seconds East (N 87 degrees 18' 20" E) eight hundred thirty five and ninety-one hundredths (835.91') feet to a point , being an iron pin;

THENCE through the James Latimore Tract  South twenty nine degrees thirty six minutes forty seconds East (S 29 degrees 36' 40" E) one hundred forty and nineteen hundredths (140.19) feet to a point, being an iron pin,

THENCE in a westerly direction through the said lands of the James Latimore Tract , Matthew Eggert Warantee Tract and lands recorded in Deed Book 1088, page 387, said line being South eighty seven degrees, eighteen minutes and twenty seconds West (S 87 degrees 18' 20" W) eight hundred ninety-five and seventy-six (895.76) feet to a point being on a line common to the East line of North Church Strcet and West line of said lands recorded in  Deed Book 1088, Page 387;

THENCE in a northerly direction on a line common to the east line of North Church Street  and west line of said lands recorded in Deed Book 1088, Page 387, said line being North two degrees forty one minutes forty seconds West (N 2 degrees 41' 40" W) one hundred twenty five and zero hundredths  (125.00) feet to a point, the place of beginning.

EXCEPTING OUT OF THE ABOVE the following described premises which have been herefore conveyed to  Hazelton National Bank by Deed of Metropolitan Motor, Inns, Inc., dated  August 4,1975 and recorded August 5th, 1975 in Luzerne County Deed Book 1062 , Page 708;

ALL THAT CERTAIN or parcel of land situated in the Hazle Township, Luzerne County, Pennsylvania, bounded and described as follows;

BEGINNING at  a point, an iron pin at  the northwest  corner of the lands herein described and located in the east line of North Church Street South two degrees forty one minutes forty seconds East (S 02 degrees 41' 40" E) three hundred twenty five and zero hundredths (325.00') feet from an iron pin located sixty four (64) feet northward along the East side of North Church Street from the northeast corner of North Church and Thirthieths Streets;

THENCE in an Easterly direction North eighty seven degrees eighteen minutes twenty seconds East (N .87 degrees 18'20" E) three hundred (300) feet to a point;

THENCE in a southerly direction South two degrees forty one minutes forty seconds East (S 2 degrees 41' 40" E) one hundred twenty five (125)  feet to a point;

THENCE in a westerly direction South eighty seven degrees eighteen minutes twenty seconds West (S 87 degrees 18' 20" W) three hundred (300) feet to a point in the Easterly line Church Street.

THENCE in a northerly direction North two degrees forty one minutes forty seconds West (N .02 degrees 41' 40" W) one hundred twenty five (125) feet to the place of beginning;

BEING the same property described as follows: (Being the remaining described by its perimeter as follows:)

ALL THAT CERTAIN piece or parcel of land situate in the Township of Hazle, County of Luzerne, and the commonwealth of Pennsylvania, being more particularly bounded and described as follows to wit:

BEGINNING at a point on the Easterly right-of-way line of Church Street  (60 feet wide) and continuing in a northerly rection N 02 degrees 41' 40" W , a distance of 325.00' to a point;

PAGE 2          JAN-4-05  3:44PM;          7325487514;          SENT BY: HP LASERJET 3150;

EDGE TECHNOLOGIES IN                    PAGE 04

## ChiCAGO TITLE INSURANCE COMPANY

THENCE leaving said rithg-of-way and following the dividing line of the herein described property and land of now of now or formaly U.S Restaurant Properties N 87 degrees 18' 20" E. a distance of 215.00' to an iron pin found;

THENCE following on the Easterly right-of-way of a proposed 20' alley N 02 degrees 41' 40" W, a distance of 186 feet to a point;

THENCE leaving said right-of-way and continuing South 81 degrees 54' 00" East a distance of 625 feet to an iron pin found;

THENCE continuing S 05 degrees 26' 50" W, a distance of 200.08 feet to an iron pin found;

THENCE continuing S 11 degrees 55' 20" E, a distance of 199.10 feet to an iron pin found;

THENCE continuing S 29 degrees 38' 20" E, a distance of 139.75 feet to an iron pin found;

THENCE continuing along the dividing line of the herein described property and land now or formally of the Yarnulla Trucking and Excavating Company, Inc., S 87 degrees 18' 20" W, a distance of 595.76 feet to an iron pin found;

THENCE continuing along the dividing line of the herein described property and lands now or formally of Danielle F. Kostrick, North 02 degrees 41' 00" West, a distance of 125.19 feet to an iron pin found;

THENCE continuing along the dividing lines of the same S 87 degrees 18' 20" W, a distance of 300.06' to a point and place of BEGINNING

Subject to any Restrictions, Easements and/or advorses that pertain to this property.

**NOTE: Being Tax ID # 5858 B16 L5&, Tax Map of the Township of Hazel, County of Luzerne.**

## SCHEDULE B

PART I:      YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| **Nataraja Pothireddy** | **33.33%** | **Common stock** |
| **Prakash Nyshadham** | **33.33%** | **Common stock** |
| **Mado Gadepalli** | **33.33%** | **Common stock** |

PART II:           THE FACILITY:

Primary designation of Facility:  **Ramada Inn**

Number of approved guest rooms: **106**

Parking facilities (number of spaces, description): **187**

Other amenities, services and facilities: **2 floors with exterior corridors, outdoor pool and exercise room.**

PART 111:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
             COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

32

# RAMADA®

*Attn: GLENN*

*from MADO*
*1/8/04*

### FRANCHISOR: RAMADA FRANCHISE SYSTEMS, INC.
### "SCHEDULE B PART III"
### PUNCHLIST FOR CHANGE OF OWNERSHIP
### OCTOBER 27, 2004
### (Revised December 8, 2004)

**FACILITY**
Ramada Inn #11568
Route 309 North
Hazleton, PA 18202

**TIER**
Inn

**GUESTROOMS**
106 Rentable
__1 Manager's Apartment
107 Total

**OWNER/APPLICANT**
Mado Gadepalli
(973) 727-3564

**FRANCHISE**
**RETENTION**
Glenn Bisbing
(973) 496-2858

**Q.A. REPRESENTATIVE**
Terry Howell

### PROPERTY CONDITION SUMMARY

This 30+year-old property consists of two, 2-story, exterior corridor, double-loaded, rectangular-shaped guestroom buildings that are connected via covered walkways to a 1-story commercial building. Construction is concrete block with a stucco facade. Some upgrades to the building exteriors, public areas and guestrooms are required to meet System Standards. Landscaping will require some upgrades to maximize curb appeal.

There is 1 room on property that is permanently out of service and being used as a manager's apartment. The Company reserves the right to check this closed room periodically to ensure it is not being utilized. Additionally, this room may not be used for any purpose without the expressed, written consent of the Company.

This property is located near the junction of I-80 (exit #39) and I-81 (exit #41) along Route 309 approximately 80 miles Northeast of Harrisburg, PA. Clientele consists of leisure, group and construction workers. Competition includes Best Western, Fairfield Inn, Hampton Inn and Comfort Inn.

|  | **EXISTING** | **STANDARD** |
|---|---|---|
| Lobby Dimensions: | 1104 SF | 800 SF |
| Guestroom Dimensions: | 288 SF (54) | 288 SF |
|  | 312 SF (51) |  |
|  | 390 SF ( 2) |  |

### COMPLETION TIME
All items listed in this punchlist must be completed within the noted time frames.

